IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

JAMES ERWIN                                                    PLAINTIFF

VS.                            NO. CIV-93-160-3

RAIL LINK, INC., a corporation;
ST. LOUIS SOUTHWESTERN RAILWAY;
  a corporation; and
INTERNATIONAL PAPER COMPANY,
  a corporation                                              DEFENDANTS

### MOTION FOR SUMMARY JUDGMENT

Comes Defendant Rail Link, Inc., and moves for summary judgment, pursuant to Rule 56 of the Arkansas Rules of Civil Procedure, for the reasons set forth in the memorandum brief filed herewith.

ANDERSON & KILPATRICK
The First Commercial Building
400 West Capitol Avenue, Suite 2640
Little Rock, Arkansas 72201-3446
(501) 372-1887

By: _____
    OVERTON S. ANDERSON
    BAR NO. 73003

### CERTIFICATE OF SERVICE

A copy of the foregoing motion for summary judgment has been mailed to Mr. Charles R. Scanlon, Kujawski & Faerber, P.C., 201 West Broadway, Suite E, North Little Rock, Arkansas 72114; Mr. John P. Kujawski, Kujawski & Faerber, P.C., Richland Executive Plaza II, 521 West Main Street, Suite 200, Belleville, Illinois 62223; Mr. Richard Donovan, Rose Law Firm, 120 East Fourth Street, Little Rock, Arkansas 72201; and Mr. John Lile, Wright, Lindsey & Jennings, 2200 Worthen Bank Building, 200 West Capitol Avenue, Little Rock, Arkansas 72201, on this ____ day of June, 1993.

**FILED**

JUN 09 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

_____
OVERTON S. ANDERSON

10-CV-156
Defendant
EXHIBIT
D

EXHIBIT

A

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

JAMES ERWIN                                                    PLAINTIFF

VS.                              NO. CIV-93-160-3

RAIL LINK, INC., a corporation;
ST. LOUIS SOUTHWESTERN RAILWAY,
 a corporation; and
INTERNATIONAL PAPER COMPANY,
 a corporation                                               DEFENDANTS

## SUMMARY JUDGMENT

On motion of defendant, Rail Link, Inc., it appears that no genuine issue as to any material fact exists and that Rail Link, Inc., is entitled to summary judgment pursuant to Rule 56 of the Arkansas Rules of Civil Procedure and that the complaint of plaintiff should be dismissed with prejudice as to Rail Link, Inc.

IT IS SO ORDERED.

_____
CIRCUIT JUDGE

_____
DATE   June 21, 1994

JUDGMENT PREPARED BY:

ANDERSON & KILPATRICK
The First Commercial Building
400 West Capitol Avenue, Suite 2640
Little Rock, Arkansas  72201
(501) 372-1887

By: _____
       OVERTON S. ANDERSON

Attorneys for Defendant
Rail Link, Inc.

FILED

JUN 21 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

JAMES ERWIN                                                    PLAINTIFF

VS.                        NO. CIV-93-160-3

RAIL LINK, INC., a corporation;
ST. LOUIS SOUTHWESTERN RAILWAY;
  a corporation; and
INTERNATIONAL PAPER COMPANY,
  a corporation                                               DEFENDANTS

MEMORANDUM BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT

Comes Defendant Rail Link, Inc., and for its memorandum brief in support of its motion for summary judgment, states:

I.

FACTS

(A)  The Accident

James Erwin was injured on September 8, 1991, in the course and scope of his employment with Rail Link, Inc. ("Rail Link"). Erwin's injury occurred when a rail car struck him while he and two other Rail Link employees were conducting switching operations at the International Paper Company ("IP") plant near Pine Bluff, Arkansas. Erwin collected workers' compensation benefits provided by Rail Link. Erwin then filed this suit against Rail Link, IP, and St. Louis Southwestern Railway.

(B)  The Complaint

Of the plaintiff's 35 page complaint, only Counts I and II constitute claims against Rail Link. Count I asserts a claim against Rail Link under the Federal Employers Liability Act, 45

FILED

JUN 09 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk

U.S.C. § 51-60 ("FELA").    Count II asserts a claim against Rail Link under the Safety Appliance Act, 45 U.S.C. § 1-16 ("SAA").

Paragraph 1 of Count I of the complaint alleges jurisdiction under FELA.   The complaint alleges that Rail Link was a corporation engaged in transporting interstate commerce between various states, including the states of Arkansas, Missouri, Louisiana, and through Jefferson County, Arkansas. See paragraph 5 of the complaint. The complaint further alleges that all or part of the duties of the plaintiff as a brakeman/switchman furthered interstate commerce by Rail Link or in some way directly or substantially affected interstate commerce. See paragraphs 7 and 8 of the complaint.

Paragraph 1 of Count II of the complaint alleges application of SAA.   The operative allegations of Count II of the complaint are identical to those of Count I. That is, Count II of the complaint alleges that Rail Link is engaged in transporting interstate commerce between various states and that the plaintiff's duties as an employee of Rail Link furthered interstate commerce by Rail Link or in some way directly or substantially affected interstate commerce. Compare, paragraphs 1 through 5 of Count II to those of Count I.

### (C) Rail Link's Answer

The answer of Rail Link denies the allegations of Counts I and II of the complaint to the effect that Rail Link was engaged in transporting interstate commerce between the various states and that the duties of Erwin furthered interstate commerce by Rail Link

or in some way directly or substantially affected interstate commerce. The answer of Rail Link admits that Erwin was employed by Rail Link on September 8, 1991, and that he sustained certain injuries on that date while working as an employee of Rail Link on premises of IP near Pine Bluff, Arkansas. See answer, paragraph 18. The answer of Rail Link further asserts that neither FELA nor SAA had any application to Rail Link. See paragraphs 30 and 31 of Rail Link's answer. The answer further asserts that the exclusive remedy provision of the Arkansas Workers' Compensation Act applied to provide immunity to Rail Link. See paragraph 32 of the answer.

### (D)  The Federal Statutes

45 U.S.C. § 51 states in part:

> Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 2 states in part:

> It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

### (E)  The Affidavit of James W. Benz

The affidavit of James W. Benz is attached hereto as Exhibit "A." As that affidavit establishes, Rail Link is not a "common carrier by railroad" engaged in "commerce between any of the several states" as required by FELA. See 45 U.S.C. § 51. As the Benz affidavit further establishes, Rail Link is not a "common carrier engaged in interstate commerce by railroad" as required by SAA. See 45 U.S.C. § 1.

Rail Link provides what is known as rail switching services by contract to certain manufacturers, including IP. Those services are in-plant only or internal movement services that are needed inside of industrial plants and facilities to support the primary purpose, manufacturing, at those plants and facilities. Once rail cars come into the plant from the outside, Rail Link performs rail switching services in connection with the loading/unloading process. Those services can be performed only on the tracks within the premises that are owned and controlled or leased and controlled by the plant or facility. In effect, the services Rail Link provides are an extension of its customer's business because Rail Link does only work that is tied directly to the manufacturing operation. Rail Link's service is narrow in scope. Rail Link has no responsibility for the condition or maintenance of the track or of the railroad equipment on the plant. The relationship governing the care, custody, and control of railroad equipment moving to and from IP's plant trackage resides with the railroads and IP, but never with Rail Link. See the Benz affidavit, paragraph 4.

-4-

The services Rail Link provides are provided within specific plants pursuant to written contracts. At the time of the Erwin accident, one of the customers with whom Rail Link was under contract was IP. Rail Link's services for IP are limited to the handling of IP's shipments within IP's plant and are performed solely on track owned or leased by IP. Rail Link owns and operates two locomotives at IP's plant, but does not own or lease any rail cars, tracks, or railroad equipment. See Benz affidavit, paragraph 5.

The services Rail Link has performed for IP and which Rail Link was performing for IP on the date of the Erwin accident were performed under contract with IP. Rail Link neither provides nor offers service to members of the general public either at the IP plant or elsewhere. In fact, Rail Link cannot offer its services to the public because it does not own or lease any railroad facilities. Rail Link publishes no charges for accepting public business or engaging in any contractual relations with the public at IP. Rail Link has never held itself out as a common carrier or as willing to haul or move goods for the general public, for hire, or otherwise. See Benz affidavit, paragraph 6.

Rail Link does not have a contractual relationship with, nor is it owned by any railroad that serves the IP plant. Rail Link is not part of a system of interstate rail transportation because it does not connect with any railroad. Rail Link personnel and locomotives are prohibited from entering and using any track owned or controlled by railroads serving the IP plant. That

restriction on Rail Link is imposed upon IP by the railroads.  See Benz affidavit, paragraph 7.

Rail Link receives remuneration for its services from IP, its customer, but not from any railroad as a fixed charge or as a percentage of profits.  Furthermore, IP's compensation to Rail Link remains the same regardless of the amount of material IP ships by rail by common carrier.  Rail Link's contractual obligations run distinctly and only to IP.  Rail Link cannot participate with railroads serving IP in any tariff, contract, rate, or other charge governing interstate movements of any commodity by rail.

Neither the Federal Railroad Administration nor the Interstate Commerce Commission ("ICC") has ever asserted jurisdiction over Rail Link.  Rail Link is not registered with nor can it file tariffs with the ICC.  In addition, Rail Link was not created by issuance of a "Certificate of Public Convenience and Necessity" from the ICC, which it would have had to have obtained if it were going to operate as a "common carrier by railroad."  Rail Link provides its service to IP, at IP's discretion, and can be removed without petitioning any regulatory body, including the ICC.  See Benz affidavit, paragraph 9.

## II.

## ARGUMENT

### (A) Introduction

Although the language of the two federal acts varies somewhat, it is apparent both from a reading of them and cases interpreting them that neither act applies unless a defendant is a

common carrier by railroad engaged in interstate commerce.  See 45
U.S.C. § 2; § 51.  That is, although the plaintiff seeks a recovery
under two federal statutes, the same test applies in determining
whether those statutes have application.

### (B)   Case Law Applying the Statutes

State and federal courts considering FELA and SAA actions
have strictly construed the statutory language and have not applied
those statutes unless it is clear that the defendant is a common
carrier by railroad.  An examination of several key cases demon-
strates what factors the courts have deemed worthy of consideration
in determining applicability of FELA and SAA:

Wells Fargo & Co. v. Taylor, 254 U.S. 175, 41 S. Ct. 93,
65 L. Ed. 205 (1920), an early United States Supreme Court case, is
often cited and quoted.  Taylor involved the question whether an
express company, Wells Fargo & Co., was a "common carrier by
railroad."  Taylor was an employee of Wells Fargo.  Wells Fargo had
a contract with a railroad by which the railroad agreed to
transport express packages for Wells Fargo.  Taylor was injured in
a derailment.  The Supreme Court was called upon to decide whether
FELA applied.  The Supreme Court posed the issue as follows:

> As respects the express company, it
> appears not merely that Taylor was in
> its employ, but also that the injuries
> were received while it was engaged and
> he was employed in interstate commerce;
> and so the question is presented whether
> the act embraces a common carrier by
> express which neither owns nor operates
> a railroad, but uses and pays for rail-
> road transportation in the manner before
> shown.

-7-

The court answered the question as follows:

> In our opinion, the words "common
> carrier by railroad," as used in the
> act, mean one who operates a railroad as
> a means of carrying for the public,
> —that is to say, a railroad company
> acting as a common carrier. This view
> not only is in accord with the ordinary
> acceptation of the words, but is
> enforced by the mention of cars,
> engines, track, roadbed and other
> property pertaining to a going railroad
> . . . .

The leading Arkansas Supreme Court in the area is Malvern
Gravel Co. v. Mitchell, 238 Ark. 848, 385 S.W.2d 144, cert. denied,
382 U.S. 828 (1965). In Malvern Gravel, the Arkansas Supreme Court
was called upon to decide whether an Arkansas company was a common
carrier by railroad within the meaning of FELA. Two employees of
the gravel company sustained injuries when a third employee of the
gravel company operating a switch engine shoved a car into the car
under which the employees were working. The principal business of
the gravel company was excavating and shipping gravel. The gravel
company owned one switch engine, but no railroad cars or other
railroad equipment. The gravel company leased rails and placed
them on leased right-of-way so that it could move its products from
its plant to a point from which they could be placed on the main
lines of railroads for transport in both intrastate and interstate
commerce. In Malvern Gravel, the Arkansas Supreme Court centered
its attention on whether the gravel company was a common carrier
within the meaning of FELA. The Court said:

> There are three things that must combine
> to constitute a common carrier within
> the meaning of the Federal Employers'

-8-

> Liability Act; (1) a carrier must be
> engaged in interstate commerce; (2) it
> must operate a railroad in interstate
> commerce; and (3) it must operate a
> railroad as a common carrier.

The court cited federal authority for the proposition that an

entity was not a "common carrier by railroad" where the defendant

owned and operated railroad equipment within its own operating

plant or leased right-of-way. The court quoted from Duffy v. Armco

Steel Corp., 225 F. Supp. 737 (D.C. 1964):

> The railroad equipment owned and oper-
> ated by Armco has not been used to
> transport goods of others, nor has Armco
> offered their use to the public. Thus,
> it appears to a certainty that there is
> no genuine issue as to any material fact
> in this case. Defendant asserts, and
> the Court agrees, that defendant
> although operating in interstate
> commerce is not a common carrier by
> railroad.

The Malvern Gravel court further quoted from Kelly v. General

Electric Co., 110 F. Supp. 4 (E.D. Pa.) aff'd, 204 F.2d 692 (3rd

Cir.) cert. denied, 346 U.S. 868 (1953):

> The distinctive characteristic of a
> common carrier is that he undertakes to
> carry for all people indifferently, and
> hence is regarded in some respects as a
> public servant. The dominant and con-
> trolling factor in determining the
> status of one as a common carrier is his
> public profession as to the service
> offered or performed.

In Malvern Gravel, the Arkansas Supreme Court concluded that the

gravel company did not operate a railroad as a means of carrying

for the public and that, therefore, FELA had no application.

In Lone Star Steel Company v. McGee, 380 F.2d 640 (5th Cir.
1967) cert. denied, 389 U.S. 977, 88 S. Ct. 480, 19 L. Ed. 2d 471,
the Fifth Circuit Court of Appeals considered whether Lone Star
Steel Company was a "common carrier by railroad" such that FELA
would apply. Lone Star owned extensive properties within which it
operated its main plant for the processing and production of steel
and steel products. Lone Star had at its plant a complex system of
rail trackage and owned 8 locomotives, 94 railroad cars, and 6
railroad cranes. Lone Star handled all its own inbound and
outbound shipments and also handled inbound and outbound shipments
for several other entities which maintained facilities in and
around the plant. Those entities included subcontractors engaged
in construction work for Lone Star; entities supplying material and
equipment to Lone Star; and some 56 contractors who received
supplies by rail. Lone Star made no direct charge by way of
tariffs and received no direct freight revenues for any rail
services performed by it and published no tariffs regarding rail
movements. However, Lone Star performed some of the functions of
the common carrier railroad which serviced the area and which had
contracted to provide the services actually performed by Lone Star.
That fact, plus Lone Star's ownership of that railroad, resulted in
Lone Star becoming, in effect, part of the common carrier.

In Lone Star, the Fifth Circuit reviewed a number of
earlier cases and arrived at the following four considerations
which it felt should be looked to in determining applicability of
FELA. The court stated:

-10-

> According to these cases various
> considerations are of prime importance
> in determining whether a particular
> entity is a common carrier. First—
> actual performance of rail service,
> second—the service being performed is
> part of the total rail service con-
> tracted for by a member of the public,
> third—the entity is performing as part
> of a system of interstate rail transpor-
> tation by virtue of common ownership
> between itself and a railroad or by a
> contractual relationship with a rail-
> road, and hence such entity is deemed to
> be holding itself out to the public, and
> fourth—remuneration for the services
> performed is received in some manner,
> such as a fixed charge from a railroad
> or by a percent of the profits from a
> railroad.

The Lone Star court applied those considerations to the facts

before it and decided that the rail services Lone Star provided

were a part of the total rail transportation contracted for and

required by the entities located on the plant site and that it was,

therefore, a common carrier by railroad.

In Aho v. Erie Mining Company, 466 F.2d 539 (8th Cir.

1972), the Eighth Circuit Court of Appeals considered a claim

against a mining company brought under FELA for injuries an

employee sustained while working on the railroad operations of the

mining company. The mining company operated a railroad some 74 to

76 miles in length over which it transported taconite pellets to a

dock and shipping facility. The Eighth Circuit stated:

> The sole issue presented on appeal is
> whether Erie, in its operation of its
> railroad equipment, is a common carrier
> within the meaning of the Federal
> Employers' Liability Act. Briefly
> summarized, appellant contends that the
> railroad was an integral part of a

-11-

transportation operation involving
interstate carriers serving as customers
the industries to which the pellets were
ultimately delivered. Respondent con-
tends that the company was not operating
a common carrier because the road was
used exclusively for its own purposes,
no charges were made by reason of the
transportation and it did not meet the
definition of a common carrier who
undertakes to carry for all people
indifferently.

The Eighth Circuit considered a number of cases including *Lone Star*

*Steel Company, supra,* and held that the mining company was not a

common carrier by railroad:

It appears undisputed that the rail-
road carried only products for Erie or
its contractors working on Erie
installations; that the railroad was not
regulated by the Interstate Commerce
Commission; that the railroad performed
no direct services for other industries
or carriers; that the railroad neither
holds itself out to the public as
willing, nor is it licensed by any
agency to act as a common carrier; and
that the railroad makes no charge and
posts no tariff for its operations or
use of its equipment.

The court upheld a summary judgment in favor of the mining company.

In *Kieronski v. Wyandotte Terminal Railroad Co.,* 806 F.2d

107 (6th Cir. 1986), the Sixth Circuit Court of Appeals considered

application of FELA to a defendant which performed switching

duties. Wyandotte was a wholly owned subsidiary of BASF Wyandotte

Corporation ("BASF"). BASF had originally owned two parcels of

land on which Wyandotte performed switching operations that were

mostly in-plant for BASF. At one parcel, Wyandotte's tracks

connected to one common carrier railroad and to another railroad at

the other parcel. Wyandotte had trackage rights over a short stretch of track owned by a railroad that serviced one of the parcels so that Wyandotte could travel between the two parcels to perform its switching duties. Subsequently, BASF sold portions of its property to two other corporations. As part of the purchase agreement, BASF arranged for Wyandotte to perform switching services for the purchasers, as well as for BASF.

In _Kieronski_, the court agreed with the district court's conclusion that Wyandotte was not a "common carrier," but did not, as had the district court, rely directly on the _Lone Star_ reasoning. The court stated:

> A close reading of the language of _Lone Star_ reveals that the list cited above is a list of "various considerations" that the Fifth Circuit thought were of "prime importance" in determining whether an entity was a "common carrier." 380 F.2d at 647. We do not believe that the list of considerations should be applied as a _test_ because it is, as the _Lone Star_ court characterized it, only a list of _considerations_ for a court to keep in mind when determining whether a carrier is a "common carrier." Our review of the numerous cases determining when a carrier is a "common carrier" reveals that carriers can be divided into several categories. We believe that it is more helpful here to focus on the several categories than it is to apply the considerations of _Lone Star_ as a "four-part test."
>
> The first category we see is that of inplant facilities. Courts have long recognized that in-plant rail facilities are not common carriers, even where those facilities are quite extensive. [Citations omitted.] . . .

Another category of carriers that are not considered to be "common carriers" is that of private carriers. [Citations omitted.] Private carriers haul for others, but only pursuant to individual contracts, entered into separately with each customer.

A type of carrier that is invariably labelled a "common carrier" is a linking carrier. Where a rail entity links two or more common carriers, the linking entity has become a vital part of the common carrier system and, therefore, becomes a common carrier. [Citations omitted.] This is true where there is common ownership between the linking carrier and a linked common carrier [citations omitted] or where the relationship is purely contractual. [Citations omitted.]

Finally, there is the category in which we find Lone Star. Lone Star looks initially like a typical in-plant operation, which would not be characterized as a "common carrier," except that Lone Star's operation did not end there. Lone Star also performed some of the functions of the common carrier, functions that the common carrier's customer had contracted to have the common carrier perform. Lone Star became, in effect, part of the common carrier by virtue of Lone Star's ownership of the common carrier, combined with Lone Star's performance of the common carrier's duties. Several of the "linking" cases cited above may also fit into this category. [Citations omitted.]

In the instant case, Wyandotte argues that it was an in-plant system. We agree. Wyandotte's system connected to two common carriers, but in no way acted to "link" them or to perform functions for which the customers of the common carriers had contracted. Wyandotte merely connected the plants to the common carriers in a manner typical of in-plant systems. Our conclusion is not

-14-

> weakened by Wyandotte's right to use a
> portion of the track of the Detroit,
> Toledo & Ironton Railroad, a common
> carrier, because those rights were
> merely for the convenience of the plants
> and in no way furthered the contractual
> obligations of the common carrier.
> [Citation omitted.]

Similarly, the court stated that its conclusion was not weakened by the fact that Wyandotte was also servicing the facilities of the two corporations which had purchased portions of BASF's property. The court continued:

> Those extensions of service did not go
> beyond what was originally BASF
> property; Wyandotte retained its essen-
> tial character as an in-plant system;
> and Wyandotte did not provide services
> that the common carrier had contracted
> to perform. The system looks, at most,
> like a private carrier arrangement, with
> Wyandotte holding itself out solely to
> those businesses that owned facilities
> within the original two parcels, which
> does not lead us to characterize
> Wyandotte as a "common carrier."

### (C) Rail Link Is Not a Common Carrier By Railroad

Among the principles which may be derived from the court decisions construing FELA and SAA are the following:

(1) Unless an entity carries goods for hire by the general public, it is not a common carrier. See Wells Fargo Co., supra; Aho, supra.

(2) Unless an entity holds itself out as a common carrier by railroad and publishes tariffs or rates applicable to the general public, it will probably not be considered a common carrier. See Malvern Gravel, supra.

(3) The converse of a common carrier is a private carrier. A private carrier hauls for others, but only pursuant to individual contracts entered into separately with each customer. See Kieronski, supra.

(4) The fact that an entity is not regulated by the ICC and is not licensed by any agency to act as a common carrier is a strong indicator that it is not a common carrier by railroad engaged in interstate commerce. See Aho, supra.

(5) It does not necessarily follow that activities and facilities and equipment common to railroads means that a given entity is engaged in railroading. See Wells Fargo & Co., supra; Lone Star Steel Company, supra.

(6) It does not necessarily follow from the facts that an entity that is engaged in interstate commerce and owns and uses railroad equipment is a common carrier by railroad engaged in interstate commerce. See Malvern Gravel Co, supra; Aho, supra.

When the facts of this case as established by the Benz affidavit are applied to principles derived in controlling cases, the conclusion is compelled that Rail Link is not a common carrier by railroad engaged in interstate commerce. Accordingly, there is no genuine issue as to any material fact, and the complaint of plaintiff should be dismissed with prejudice as to Rail Link.

WHEREFORE, Rail Link, Inc., submits that its motion for summary judgment should be granted, for its costs herein expended, and all other proper relief.

ANDERSON & KILPATRICK
The First Commercial Building
400 West Capitol Avenue, Suite 2640
Little Rock, Arkansas  72201-3446
(501) 372-1887

By: _____
OVERTON S. ANDERSON
BAR NO. 73003

## CERTIFICATE OF SERVICE

A copy of the foregoing memorandum brief in support of motion for summary judgment has been mailed to Mr. Charles R. Scanlon, Kujawski & Faerber, P.C., 201 West Broadway, Suite B, North Little Rock, Arkansas 72114; Mr. John P. Kujawski, Kujawski & Faerber, P.C., Richland Executive Plaza II, 521 West Main Street, Suite 200, Belleville, Illinois 62223; Mr. Richard Donovan, Rose Law Firm, 120 East Fourth Street, Little Rock, Arkansas 72201; and Mr. John Lile, Wright, Lindsey & Jennings, 2200 Worthen Bank Building, 200 West Capitol Avenue, Little Rock, Arkansas 72201, on this _____ day of June, 1993.

_____
OVERTON S. ANDERSON

-17-

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

JAMES ERWIN                                                    PLAINTIFF

VS.                                    NO. CIV-93-160-3

RAIL LINK, INC., a corporation;
ST. LOUIS SOUTHWESTERN RAILWAY;
  a corporation; and
INTERNATIONAL PAPER COMPANY;                                  DEFENDANTS
  a corporation

## AFFIDAVIT OF JAMES W. BENZ

I, James W. Benz, having been duly sworn, do hereby state on oath as follows:

1. I am James W. Benz. This affidavit is based upon my personal knowledge of the facts stated in this affidavit which I know to be true and correct.

2. I am the president of Rail Link, Inc. (Rail Link), one of the defendants in this suit. This affidavit is provided in support of Rail Link's motion for summary judgment.

3. As president of Rail Link, I am in charge of the executive management and control of the company. In this position, I oversee and am familiar with all the services we provide to our customers, including International Paper Company in Jefferson County, Arkansas (IP). I am familiar with all contracts Rail Link has with all its customers, including IP. I am in charge of the purchase of company equipment and, thus, know how much and what types of

EXHIBIT
"A"

equipment Rail Link has to own or lease to provide its services inside the plants in which it operates. Finally, I oversee Rail Link's compliance with federal and state licensing requirements.    As a result, I know what certification Rail Link must obtain to operate as it does.

4.    Rail Link is in the business of providing rail switching services.  Rail switching services are inplant only or internal movement services that are needed inside of industrial plants and facilities to support the primary purpose, manufacturing, at those plants and facilities. Once railcars come into the plant from the outside, Rail Link performs these rail switching services in connection with the loading/unloading process.  These services can be operated only on the tracks within the premises that are owned and controlled or leased and controlled by the plant or facility.

In effect, the services that Rail Link provides are an extension of its customers' business because Rail Link does only the work that is tied directly to the manufacturing operation.  Rail Link's service is narrow in scope, however, and Rail Link has no responsibility for the condition or maintenance of the track or of the railroad equipment on the plant.  The relationship governing the care, custody and control of railroad equipment moving to and from IP's plant trackage resides with the railroads and IP, but never with Rail Link.

2

5.   Rail Link provides its services within specific plants pursuant to written contracts.  At the time of the accident involving James Erwin, one of the customers with whom Rail Link was under contract was IP.  Rail Link's services for IP are limited to the handling of IP's shipments within IP's plant and are performed solely on track owned or leased by IP.  Rail Link owns and operates two locomotives at IP's plant, but does not own or lease any railcars, tracks, or railroad equipment.

6.   The services Rail Link has performed for IP and which Rail Link was performing for IP on the date of the accident involving James Erwin were performed under contract with IP.  Rail Link neither provides nor offers service to members of the general public either at the IP plant or elsewhere.  In fact, Rail Link cannot offer its services to the public because it does not own or lease any railroad facilities.  Rail Link could not solicit business from the general public even it if wished to do so because Rail Link does not have any location or facility to initiate or terminate shipments.  Moreover, Rail Link publishes no charges for accepting public business or engaging in any contractual relations with the public at IP.  Rail Link has never held itself out as a common carrier or as willing to haul or move goods for the general public, for hire or otherwise.

7.   Rail Link does not have a contractual relationship with, nor is it owned by any railroad that serves the IP

3

plant, and thus, is not part of the system of interstate rail transportation. It is not part of a system of interstate rail transportation because it does not connect with any railroad. Rail Link personnel and locomotives are prohibited from entering and using any track that is owned or controlled by the railroads serving the IP plant. This restriction on Rail Link is imposed upon IP by the railroads.

8. Rail Link receives remuneration for its services from IP, its customer, but not from any railroad as a fixed charge or as a percentage of the profits. Furthermore, IP's compensation to Rail Link remains the same regardless of the amount of material IP ships by rail via common carrier. Finally, Rail Link's contractual obligation runs distinctly and only to IP. Rail Link cannot participate with railroads serving IP in any tariff, contract, rate or other charge governing interstate movements of any commodity by rail.

9. Neither the Federal Railroad Administration nor the Interstate Commerce Commission (ICC) has ever asserted jurisdiction over Rail Link. Rail Link is not registered with, nor can it file tariffs with the ICC. In addition, Rail Link was not created by the issuance of a "Certificate of Public Convenience and Necessity" from the ICC, which it would have had to have obtained if it were going to operate as a "common carrier by railroad." Consequently, Rail Link provides its service to IP, at IP's discretion and

therefore, can be removed without petitioning any regulatory body, including the ICC.

Further, affiant sayeth not.

Signed this 5TH day of MAY , 1993.

_James W Benz_
JAMES W. BENZ, Affiant

STATE OF _Virginia_ )
                                      ) ss.
COUNTY OF _Chesterfield_ )

SUBSCRIBED AND SWORN to before me, a notary public, on this 5 day of _May_ , 1993.

_Catherine S Bell_
NOTARY PUBLIC

My Commission Expires:

_4/30/94_
(SEAL)

5